## OF THE

# SUPREME COURT OF APPEALS

### OF

# WEST VIRGINIA.

---

## CHARLESTON.

### FINDLEY *v.* CUNNINGHAM.

Submitted September 5, 1901.    Decided March 28, 1903.

1. DEBT—*Statute of Limitations.*
    An executor or administrator cannot make a new promise to pay a debt of his decedent either before or after the debt has been barred by the statute of limitations.   (p. 3).

2. ADMINISTRATOR—*Statute of Limitations.*
    The answer of an administrator pleading the statute of limitations to a demand against the estate of his decedent goes to the defence of both the personal and real assets.   (p. 3).

3. COPARCENER—*Agency—Estates.*
    The answer of one coparcener to a bill to set up a demand against the estate of the father of the coparcener and charging that in making a new promise he acted as agent for his coparceners, which answer denies such agency, operates as a denial of the charge of agency by the other parceners, though they have not appeared.   (p. 4).

Appeal from circuit court, Berkeley county.

Bill by James Findley against W. L. Cunningham and others. Decree for plaintiff, and defendants appeal.

*Reversed.*

FAULKNER, WALKER & WOOD, M. T. ENGLES, and A. C. NADENBUSCH, for appellants.

FLICK, WESTENHAVER & NOLL, for appellee.

BRANNON, JUDGE:

The administrator of S. S. Cunningham brought a chancery suit against the estate of James L. Cunningham to convene the latter's creditors and satisfy his debts out of his real and personal assets. The bill alleged that James L. Cunningham had made to S. S. Cunningham a note for $2,314.40, and one for $100.00, and sought to enforce their payments out of said assets. The two administrators of James L. Cunningham and his heirs were parties. An amended bill was filed substantially the same as the original. One of the administrators answered those bills denying the existence of the debts of S. S. Cunningham, and pleaded the statute of limitations against them. The case was referred to a commissioner to ascertain the debts against James L. Cunningham's estate, and he reported the bond of $2,314.40 as barred. Then the heirs filed their answer denying indebtedness under said notes and pleading the statute. The plaintiff filed a second amended bill filing certain letters written by William L. Cunningham, who was one of the administrators of James L. Cunningham and one of his children, to S. S. Cunningham, and claiming that they operated as new promises by the administrator, binding the estate for the full new period of the statute after their dates, and that they also bound the said William L. Cunningham and other children as heirs to the continued liability of the real estate for those debts. This second amended bill also charged that in writing those letters William L. Cunningham acted as agent for the other administrator and for his co-heirs, and thus bound them by a new promise, and charged the real assets for the debts. These letters were written before the bond was barred. This amended bill was sworn to. William L. Cunningham as administrator and as heir answered, denying its allegation that he acted as agent of the other administrator and the other heirs, but those heirs did not answer said second amended bill, and it was taken for confessed against them. A decree was entered charging the personal and real as-

sets with both of the bonds in favor of S. S. Cunningham's estate, and both the administrators and heirs appeal.

As to the question whether an executor or administrator can, before a debt against the estate has been barred by the statute of limitation, by a written promise debar the estate from the benefit of the statute. Section 9, chapter 104, Code, reads:

"No acknowledgment or promise by any personal representative of a decedent or by one of two or more joint contractors, shall charge the estate of such decedent, or charge any other of such contractors in any case, in which, but for such acknowledgment or promise, the decedent's estate or another contractor could have been protected under the sixth section of this chapter." This is literally the same as section 8, chapter 149, Virginia Code of 1849. How was the law before 1849? The great current of authority said that an administrator could not revive a debt already barred. Wood Lim. s. 190; note 12 Am. D. 659; Angell on Lim. s. 265. I assert what the opinion in *Seig* v. *Acord*, 21 Grat. 371, asserts and shows, that such was always law in Virginia. But the law in Virginia, as elsewhere generally, was that an executor could, by a promise to pay, give a new term to a debt not barred. *Braxton* v. *Harrison*, 2 Leigh 532. To restrain this power to a limited extent, that is, as to realty of a decedent, in 1841, the Virginia Legislature passed an act containing the provision, "No debt shall be protected against the operation of the statute of limitations by this act, nor by any *assumpsit* of the executor or administrator, so as to charge the real estate in the possession of the heirs or devisees with the payment thereof." Here we have the broad enactment that no promise by an executor or administrator shall give the debt a prolonged force against realty. There is no hint that his promise should be void as to a barred debt, but good as to one not barred. The act makes no such distinction. Can we suppose that it was the purpose of section 8, chapter 149, Code 1849, to narrow the law of 1841, and to charge real estate by the promise of an executor, whereas it would not by the act of 1841? It would be a violent assumption to say so. That it was not so intended is clearly shown by the note of the revisors who reported the Code of 1849 to the Legislature for its action. That note says that section 8 would "accomplish the object of the latter part of the act of 1841-2," that is attain the object, afford the same protection to realty as

did the act of 1841. Revisors Report 744. No other section was inserted to retain the act of 1841, as there was no need of another section. Now, the Code of 1849 for the first time made real estate of a decedent assets for payment of general debts the same as personalty, and we cannot suppose that it was intended to make an executor's promise charge the personality, and not the realty. Of course, that idea cannot be for a moment entertained. It was the design in 1849 to protect both against an executor's promise in the only case in which they needed protection, that is, where the promise was to pay a debt not yet barred. The law already protected both personalty and realty against an executor's promise to pay a barred debt. The act of 1841 went a step farther and protected realty against a debt not yet barred, and when in 1849 both personalty and realty were made alike liable to all debts, the same protection was meant for both. There was no longer reason to make the difference between personalty and realty made by the act of 1841. The law already denied effect to an executor's promise to pay a barred debt, and we must say that the Code of 1849 meant some change, and that was to protect both alike, to deny any power in an executor or administrator to add to the burden of the estate to make it liable where without his act it would be exempt. In construing a statute we look at the evil to be remedied, and that was the power of an executor to promise payment of a live debt not his power to revive a dead one, as he had no such power. The probability arising from the state of the law up to 1849, and the making of both personality and realty assets for debts, and the adoption of section 8, seems likely and strong; but that probability does not rest on those influences alone, but it becomes a certainty when we look at the report of the Revisors. It adverts to English cases holding that a new promise by an executor must be express, and must be by both where there are two, and then says: "We think it wise not only to follow it so far as it has gone, but to go a step farther, and in accordance with the opinions of the Supreme Court of the United States, in *Thompson* v. *Peter,* 12 Wheat. 565, and of the supreme court of Pennsylvania in *Fritz* v. *Thomas,* 1 Wheat. 66, established that in an action against a personal representative, no proof of acknowledgment or promise by him will take the case out of the statute of limitations. The section will accomplish this purpose, and at the same time attain

the object of the latter part of the second section of the act of 1841-2, p. 55, chapter 98, which provides that no debt shall be protected against the statute of limitations by any *assumpsit* of the executor or administrator, so as to charge the real estate in the possession of the heir or devisee with the payment thereof." The Legislature passed section 8 with that explanation of its aim and legal effect before it, and may we not therefore say that it intended to utterly deny in all cases power in an executor or administrator to make any promise having any effect to prevent the bar of the statute? And why should this power not be denied? The man is dead; the administrator takes the estate as he finds it simply to gather in assets, pay debts and distribute. Chief Justices Marshall and Gibson in the cases just mentioned strongly condemned the policy of allowing a dead man's representatives to bind the estate, as he does not possess requisite information touching the debt to do so, and for other reasons.

Take the words of section 9. How comprehensive. "No acknowledgment or promise" shall charge the estate "in any case * * * in which the decedent's estate * * * could have been protected under the sixth section of this chapter." It frees the estate in any case where it would be free but for such promise; it eliminates the promise. There is a shadow of question arising from the words "could have been protected." The words are in the past tense of of the potential mode. The section does not say "would be protected." From this it may be said that the words refer to the date of the promise, and that in the case of a debt then still alive it could not have been protected by the statute, and the promise makes it no worse, whereas, as to a dead debt the law would protect it but for the promise. I shall not be so dogmatic as to say that this argument has not force; but I will say that it is only one of several considerations entering into the question, and not conclusive or outweighing others. It is only misuse of a tense. It does not, ought not, frustrate what, considering everything pertinent, was manifestly the aim of the law makers.

Another argument is that section 8, chapter 104, of our Code contains the broad provision that any one may make a new written promise, and thus lose the benefit of limitation; and section 9, comes in directly following making an exception to the capacity to make such new promise, disabling personal represnta-

tives and joint contractors from so doing. It was designed to make a clean-cut exception of them from section 8—take them clear out of it.

The provision as to joint contractors in section 9, chapter 104, throws light on this question. At common law a new promise by one of two joint contractors deprived the other of the plea of limitation. In 1838 an act was passed reading: "And where there shall be two or more joint contractors, executors or administrators of any contractor, no such joint contractor, executor or administrator, shall lose the benefit of the said enactment, or either of them, so as to be chargeable in any respect or by reason only of any written acknowledgement or promise made or signed by any other or others of them."

The revisors and the Legislature in adopting the Virginia section 8 must have considered that all the provisions of this act as to contractors would be attained by section 8. They left out the words of the act of 1838, "executors or administrators of any contractor." They were not necessary. Suppose a promise by his administrator. It was deemed unnecessary to retain those words, as the words "executor or administrator" in the act would apply to both the executor of a single and joint contractor. Do you suppose that if one joint contractor should make a new promise to pay either a dead debt or one alive, it would have any effect? I think not. Why does not the section including both operate alike as to both joint contractor or a decedent? Before this act, as it assumes, an executor of a joint contractor could bind the surviving contractor by a promise before the debt was barred, and also after, some say. This act plainly takes this power entirely away in both cases, if he had that power in both cases. The act of 1838 was not re-enacted in the Code of 1849, unless section 8 provides for it. If it does not include an executor of a joint contractor, then what? He has today the power, as at common law, to make such promise; but I cannot think it was so intended.

You may, however, answer that the word "representative" in section 8 includes the executor of a joint contractor, and that, as in the case of a single contractor, the executor can only promise when the debt is not barred. Even if so, then it follows that there is no law to prevent such promise where the debt is yet in life, according to the view opposite my view. Who believes that

the Legislature meant thus to recant the act of 1838, and allow
an executor to prolong a debt yet unbarred? It did not so in-
tend. It thought that section 8 would cover this case, and if it
did not design to let the executor of a joint contractor promise
so as to bind the survivor, why let an executor of a single debtor
do so? My opinion is that by section 8, chapter 149, Code 1849,
and section 9, chapter 104 of our Code, the word executor of a
several or joint contractor is meant. His powers are in both
cases taken away, in the same cases and to the same extent. This
was the mission of that section. It did not intend to repeal the
act of 1838, but intended to make the executor of both a single
and joint contractor powerless to promise. If not, then the act
of 1838 is repealed.

I cannot on the whole think that the Legislature intended to
allow the act of a decedent's representative to delay for years the
closing of the estate and the distribution of the assets, or add to
the burden of its liability. It designed that he should take the
estate just as the dead man left it, and wind it up. It is not
contended by counsel that any case in either of the Virginias
decides this question, but that in three cases opinions have been
expressed that an executor can give extended life to a demand
by a written promise. These opinions are *obiter*. In *Braxton*
v. *Harrison,* 11 Grat. 30, and *Switzer* v. *Noffsinger,* 82 Va. 524,
are such obiters. The first case arose before the Code of 1849.
Judge Moncure in saying that it was well settled that an executor
could make an effectual promise to pay a debt not barred likely
had in mind the law as it was before the Code of 1849. The ex-
pression was merely a passing expression in the other case not
considered well. So in *Smith* v. *Pattie,* 81 Va. 662.

And further, if the promise of an administrator could, as it
cannot, give prolonged life to a debt as to the personality, it
could not as to the realty, with which he has no connection.
Even where the administrator may make new promise, he cannot
thereby charge realty. *Steel* v. *Steel,* 4 Ala. 438; *Bevers* v.
*Park,* 88 N. C. 456. As no promise of an administrator can
avail, this remark is useless; but the decree charged the realty
in this case.

As the heirs pleaded the statute of limitations in their answer
to the original and first amended bill, that was sufficient though
they did not answer the second amended bill. If this were not

so, there can be no doubt but that the answer of the administrator to that bill would serve the heirs as to the defence of the statute. When he defends the personalty, he defends the realty. If a debt does not bind personalty, neither does it bind the realty of a decedent; its defeat as to one is defeat as to the other.. This plea certainly defends the interest of the children as to their share in the personalty, and it would be dry technicality for the court to exempt the personalty on the plea of the statute by the administrator and then hold the realty liable because the heirs have not pleaded it. Is it possible that in a chancery suit to charge both personalty and realty of a decedent with debts, the plea of limitation by the administrator is not enough, but the heirs must also plead it?

But it is contended that the second amended bill setting up the letters written by one administrator as new promises, and charging that in writing them he acted as agent for the other heirs, stands without answer by them, and is taken for confessed as to them, and proves such agency without other proof, and binds the land by the new promises. The answer says it is "the separate answer of William L. Cunningham, one of the administrators." Is it that of William L. Cunningham as an individual heir, the word "administrator" being mere description of the person? We must look at the pleading entire. It contains matter proper for the party to put in for the defence of the estate, denying the bond and pleading limitation; and proper for his own defence; that same matter, and that he did not write the letters binding his interest in the estate; and it denied the agency. Thus, we ought to treat it as the answer of the administrator and in his own right as an individual heir. I hold that as an answer of the administrator and of one coparcener, since the interest of the heirs are joint, and the liability of all grows alone from the bond of the ancestor, as the heirs are sharers in both personalty and realty, that answer serves to defend both estates and all the heirs. Why not? It denies the same facts which their answers would deny. The fact it denies, if true, operates to defeat the whole demand, as well for one heir as another. It is the same defence common to all. It would be unreasonable to say that there is no debt as to the personalty, yet a binding one as to realty; or no debt because defeated as to one heir, yet a debt as to the others. High authority sustains this position. In *Clason*

*r. Morris,* 10 Johns. 524, 538, Spencer, J., said: "I believe not a case can be found in which it is insinuated that where there are two defendants having a joint interest, and one appears and answers, and disproves the plaintiff's case, the plaintiff can have a decree against the other who had made default, and against whom the bill was taken *pro con fesso.* It would be unreasonable to hold, that because one of the defendants had made default, the plaintiff should have a decree against him, when the court is satisfied from proofs offered by the other that in fact the plaintiff is not entitled to a decree. Though I have not met with a case in equity to the point, yet pursuing the analogy between proceedings at law and in equity, we are not without very clear authority; for it is a well settled principle that in actions upon contracts, the plea of one defendant enures to the benefit of all; for the contract being entire, the plaintiff must succeed upon it against all or none; and therefore if the plaintiff fails at the trial upon the plea of one defendant, he cannot have judgment against those who let judgment go by default. It would require the most binding authority to induce me to yield assent to such a proposition set up by respondent's counsel; and indeed the result would be extraordinary; for if one defendant entitled himself to a decree, where the interest is joint and inseperable, a decree must be made in his favor as to a moiety of the matter in issue, and against the other in default for the other moiety; that is, the plaintiff would get half a decree, and the other defendant the other half." This principle is sustained by *Ashby r. Bell,* 80 Va. 811, where one defendant to a joint obligation pleaded limitation and the bill was taken for confessed as to another, the plea was held good as to both, and it was announced as law that where the cause of action is joint, and one defendant disproves the plaintiff's case, unless it be on some defence purely personal to himself, no decree can go against the others. This is where the defence is common to all. *Carlique v. Raymond,* 4 Leigh 579, holds the same. In a suit to charge land as fraudulently conveyed to a party her administrator answered denying the fraud and asserting that the grantee paid value for the conveyance. It was held that this answer went to the defence of the heirs, who did not answer. The administrator had no connection with the land, and the personalty was not involved; but there was the answer opposing the defence. *Terry* v. *Fontaine,*

83 Va. 45. But how as to the agency. Principles above apply. William L. Cunningham denied it. Could it be decreed to exist alone on the bill because the other heirs did not answer in the face of that denial? In *Johnson* v. *Zane,* 11 Grat. 568, the court said: "It is said that though Mrs. Zane has not answered, and the allegations of the bill are as to her to be taken for confessed, and that therefore the pre-existence of the debt being admitted, the appellant is entitled to relief to the extent of any interest she may have in the subject. I have, however, already shown that there is no such allegation in the bill; and if there had been, the answer of Shriver, the trustee, would serve to put it in issue for her benefit, and that all others claiming under the deeds. "For this purpose, he may properly be regarded as representing the *cestius que trust,* and his answer will enure alike to the benefit of all."

A trustee sold land under a trust deed. The purchaser alleged that the creditor agreed to make a general warranty, and he was unwilling to accept a trustee's deed. The trustee denied this contract in his answer, and it was held that this answer went to the benefit of the heirs of the creditor to deny that contract, though they did not appear. The fact set up by the trustee defeated the claim, because it showed there could be no decree on its basis. *Payne* v. *Graves,* 5 Leigh 561, 579. On these principles I think that answer denying the agency operated as a denial of it for all the heirs. These letters do not purport to have been written as agent. They bear no mark of being acts of an agent or in behalf of any principal, which they must do to bind by their force. Mechem, Agency secs. 432, 445; 1 Am. & Eng. Ency. L. 1035. There is nothing else appealed to to show such agency except that William L. Cunningham managed the land and was trying to sell. This he would do for himself. And what if in that he was acting for them? No general agency is proven, and if he was agent in managing or trying to sell the land, that does not prove that he was special agent to make a new promise. His special power for that act must be shown, and it is not. William L. Cunningham never declared that he was special agent to make such promise for the other heirs. His acts cannot make him such, though they expressly purported to be done as agent, as "Neither the declarations nor acts of a man can be given in evidence to prove that he is the agent of an-

other." *Garber* v. *Blatchley,* 51 W. Va. 147.   One dealing with·
a special agent must look out for his authority.   *Dyer* v. *Duffey,*
39 W. Va. 148.   Those letters do not prove agency, could not if·
they spoke agency; but they do not so speak.

Do those letters bind the interest of William L. Cunningham
in the assets?   They do not otherwise bind him; but that is not·
involved, as such is not the purpose of the suit.   1.   He wrote·
only as administrator.   He had no intent to bind himself person-
ally or his interests in the land.   2.  I cannot see that an heir·
can give a paper operating merely as a new promise of a debt of·
his father, because a new promise is by him who owes the debt,
and unless the heir gives a deed of trust on his share, I do not·
see that he can otherwise bind it.   3. The letters are not suffi-·
cient to be new promises.   In *Quarrier* v. *Quarrier,* 36 W. Va.
310, it is held: "New promise must not be uncertain.   It must
acknowledge a fixed sum, or a balance which admits of ready and·
certain ascertainment."   The promise must be express to pay, or
if a mere acknowledgment, it must be unqualified, without con-·
dition, importing intent to pay without reference to a future set-
tlement; it must be determinate and unequivocal, so as to be·
tantamount to an express promise to pay.   *Abrahams* v. *Swann,*
18 W. Va. 274; *Stansbury* v. *Stansbury,* 20 *Id.* 23.   Try the let-
ters by these rules.   One asks for amount of "your note," and·
says "I have no doubt his estate will hold out."   That will not
do.   Another says: "I want to come over to your place and talk
to you about your debt against the estate of my father."   This·
will not do.   In another he speaks of selling the farm, and says,
"I now ask you, if we cannot get that price publicly, will you.
take it at that?   You have a big pile in it—would not feel the
buying of it very much."   What that "pile" is, its amount, is
not given; simply that some indebtedness existed.   Now, an
acknowledgment must be equivalent to a promise to pay.   This·
is not.   Of course, the letter simply sending $125.00 on in-
debtedness will not do, as partial payment does not serve as a
new promise.   And there were two notes.   To which does it ap-
ply?   In another letter he speaks of the general indebtedness,
saying how he expected to arrange it, without any reference to
any particular debt, saying that none of the creditors need feel
uneasy, as the debts only amounted to $8,500, and the land would·
bring more and the heirs would sell, if they could, rather than·

carry the lead and worry. Of course, this does not acknowledge any particular debt or any amount. In one of the letters, referring to a partial payment, he said, "I hope to send you more soon." In another he speaks of his desire to sell, and of dividing the property among all creditors, and asks if S. S. Cunningham could put them on the track to borrow $5,000.00 at five per cent. He said "I would like to see you and talk about it." About what? That particular debt? Or what arrangement to make as to all? Or as to getting a loan? Or as to best means of selling or dividing the farm among creditors? The letter does not say. The expression of hope to pay soon. Pay what amount? The letter does not say. A promise to settle, or pay an amount thereafter to be agreed will not do. *Quarrier* v. *Quarier,* 36 W. Va. 310; *Bell* v. *Crawford,* 8 Grat. 110.

So, these letters are not new promises to charge even their writer's share in the estate. They are not mortgages on it.

Therefore, we reverse the decree, reject the bond of $2,314.40 given by James L. Cunningham to S. S. Cunningham as a debt against the estate of James L. Cunningham, and remand the case to the circuit court for further proceedings.

*Reversed.*


WₒWORTER, PRESIDENT, (*dissenting*) :

The executor of S. S. Cunningham, Casper Shunk, filed his bill in the circuit court of Berkeley County, at the October rules, 1895, on behalf of himself and all other creditors of James L. Cunningham, deceased, who would come in and contribute to the costs, against William L. Cunningham and J. N. Cunningham, in their own right and as administrators of said James L. Cunningham, deceased, John K. Cunningham and Annie E. Cunningham, his wife, Mattie A. Cunningham, Mary Cunningham, widow of A. P. Cunningham, E. B. Faulkner, Trustee, A. C. Nadenbusch, Trustee, E. B. Faulkner and C. J. Faulkner, administrators with will annexed of C. J. Faulkner, deceased, and the National Bank of Martinsburg, a corporation, setting up two notes made by said Jas. L. Cunningham, in his lifetime to S. S. Cunningham, one dated June 10, 1881, for $2,314.40 at one day (alleged in bill to be at one year) the other dated September 28th, 1885, for $100.00 at one day after date, that both of said

notes remained wholly unpaid, except certain payments mentioned in the bill, viz: June 27, 1885, $100.00; March 14, 1889, $125.00; May 3, 1893, $277.72, paid by W. L. and J. N. Cunningham, administrators of Jas. L. Cunningham, deceased, and March 31, 1893, $500.00 paid by W. L. Cunningham, one of said administrators, and May 7, 1894, $100.00 paid by W. L. Cunningham, all of which payments were applied to the larger note, alleging that on the 25th day of August, 1886, said Jas. L. Cunningham in his lifetime wrote a letter and signed by himself and delivered same to S. S. Cunningham acknowledging said note for $2,314.40 to be due and unpaid and promised to pay the same, but no part of it had ever been paid, except said payments mentioned; that said James L. Cunningham departed this life intestate August 25, 1887, and defendant administrators were duly appointed and qualified as such; that in 1895 S. S. Cunningham died, leaving a will in which plaintiff was appointed executor and who was duly qualified as such executor; that said Jas. L. Cunningham left a widow who died in February, 1895, and left as his heirs at law the following children: John K. Cunningham, whose wife's name is Annie E. Cunningham, William L. Cunningham, a single man, J. N. Cunningham, a single man, Mattie A. Cunningham, a single woman, and A. P. Cunningham, who some time in the spring of 1895 died intestate without children, leaving a widow, Mary Cunningham, and his brothers and sisters as his heirs at law, that said Jas. L. Cunningham left a large and valuable personal estate, which passed into the hands of the administrators, amounting as shown by their sale list to $4,536.49; that said administrators had made no settlement of their administration accounts; that in addition to the personal estate said decedent left two valuable tracts of land in Berkeley County, one containing two hundred and nineteen acres, one rood and twenty-nine perches, the other four hundred and eighty-nine acres, one rood, specifically described in the exhibits filed with the bill; that on September 12, 1887, the widow and heirs of said James L. Cunningham conveyed all of said real estate to A. C. Nadenbusch, trustee, to secure the payment to E. B. Faulkner and C. J. Faulkner, administrators with the will annexed, of C. J. Faulkner, deceased, in indebtedness of $3,500.00, evidenced by three certain bonds of said heirs bearing even date with said deed of trust, which deed was filed as an exhibit; and alleges the

payment of said bonds although the deed of trust was not re-
leased upon the records; that on December 3, 1889, said A. P
Cunningham conveyed to E. B. Faulkner, trustee, all of his in-
terest in said tracts of land in trust to secure William L. Cun-
ningham and J. N. Cunningham as endorsers on a note for
$500.00 made by said A. P. Cunningham payable ninety days
after date and discounted at the National Bank of Martinsburg,
and exhibited said deed of trust and alleged that same had been
paid off though not released on record; that besides his own he
knows of no other indebtedness against the estate of said James
L. Cunningham, and prayed for convention of the creditors, and
order of reference to ascertain debts, priorities, etc., and settle-
ment of accounts of administrators of said decedent.

At March rules, 1896, by permission of the court James Find-
ley, who had been appointed administrator *de bonis non con
testamento annexo* of S. S. Cunningham, deceased (the executor
Shunk having died) filed his amended bill against the same par-
ties named as defendants in the original bill and L. C. Gerling,
sheriff, administrator of A. P. Cunningham, deceased, which
amended bill corrects the dates of some of the payments on said
larger note as stated in the first bill, and praying for settlement
of administration accounts of said administrators and distribu-
tion of the personal assets among the parties entitled thereto, and
that should the personal estate prove insufficient to pay all the
plaintiff's debt, the real assets left by said James L. Cunning-
ham, and which descended to his heirs who are made parties to
the suit, might be subjected to the payment of said indebtedness
and for general relief.

On the 21st of January, 1897, the answer of William L. Cun-
ningham, one of the administrators, was filed and general repli-
cation thereto, and the cause was referred to commissioner in
chancery W. B. Colston, with instructions to state and settle the
accounts of said administrators of Jas. L. Cunningham, to ascer-
tain and report the real estate of said decedent James L Cun-
ningham with its fee simple value; the debts against the estate
of said decedent, together with their respective amounts and
priorities. The answer of said Cunningham admitted the execu-
tion of the deeds of trust as alleged in the amended bill, did not
admit the making of the notes of $2,314.40, and $100.00 as al-
leged but controverted the making thereof by his intestate, and

denied the writing of the letter of August 25, 1886, by his testator as alleged, acknowledging said note of $2,314.40, and promising to pay it, and averred that no promise in writing or acknowledgment of said notes had been made by his said decedent or by his administrators or either of them within the period of ten years next before the commencement of this suit which would bind James L. Cunningham's administrators or executors or his heirs for the payment of said sums of money, and expressly set up the statute of limitations as a bar against the collection of the said notes or either of them by plaintiff. On the 13th of July, 1897, William L. Cunningham and J. N. Cunningham, in their own right and John K. Cunningham, Mattie A. Cunningham and Mary E. Cunningham, filed their answer to the original and amended bills to which plaintiff replied generally; the answer avers that said S. S. Cunningham was at the time of his death and for more than twenty years previous thereto had been a resident of the town of Williamsport in Maryland just on the opposite side of the river from Berkeley County in West Virginia, and owned quite a considerable quantity of property in said Berkeley County, and for a long period of years had been president of a bank in Williamsport and director thereof, which did a large amount of business with the citizens of Berkeley County, such as is generally transacted between banks and their customers and patrons, including loaning money, discounting notes, etc., and that during such time S. S. Cunningham's acquaintance with business people and transactions in Berkeley County was quite extensive, making loans to, and taking notes and bonds from many of them either on his own account or on account of his said bank; that although respondents did not admit the making of the note or bond by James L. Cunningham for $2,314.40 to said S. S. Cunningham, and denied the same, they averred that the said administrators of James L. Cunningham, or one of them did send to said S. S. Cunningham on the 31st of March, 1893, the sum of $500.00 and on the 7th of May, 1894, the further sum of $100.00, which remittances were made by said administrators or one of them on the claim and representation to them by said S. S. Cunningham that the estate of James L. Cunningham was legally liable to him for the payment of the said sums of money, he, said S. S. Cunningham, carefully concealing the fact that if there had been any such note or bond as

the one for $2,314.40 in the bill mentioned and described, it had
long before that time been barred by the statute of limitations, a
fact unknown to said administrators until after the commence-
ment of this suit; respondents charging that the application by
the said S. S. Cunningham of the sums of $500.00 and $100.00
an alleged bond or note held by him at that time and which was
then barred by the statute of limitations, unknown however by
said administrators, was illegal and fraudulent; that so much of
said money should have been applied by him as a payment on
the $100.00 note or bond as would be sufficient to satisfy it and
the remainder of said remittances by said administrators or one
of them should have been returned to them as having been made
in ignorance and by mistake of fact, to be administered by them
according to law, and respondents claimed the benefit of the
statute of limitations as a defence against any indebtedness by
said alleged note of $2,314.40, and asked for a decree in favor
of the administrators of James L. Cunningham against said
James Findley, administrator, for the excess of the aggregate of
the said two sums over the indebtedness evidenced by the $100.00
note or bond with interest, etc. To which answer plaintiff de-
murred and filed a special replication, wherein he admits that
S. S. Cunningham lived as alleged in the answer, at Williams-
port, Maryland, and owned a considerable quantity of property
in Berkeley County, and was president and director of a bank,
but denies that said bank did a large amount of business with
the citizens of Berkeley County such as is usually transacted be-
tween banks and their customers or patrons including the lend-
of money and the discounting of notes, etc., or that his acquaint-
ance with the business people and transactions in Berkeley
County were extensive or that he frequently made loans to them
and took notes and bonds from them either on his own account
or on account of said bank; that it is true as stated that the ad-
ministrators of James L. Cunningham paid the sums of $500.00
and $100.00, that they were paid on account of the indebtedness
mentioned and described in plaintiff's original and amended
bills without any specific directions as to how the same should be
applied, and that said S. S. Cunningham in the absence of any
such direction by the party making the payments on the note
then due and owing to him from said James L. Cunningham,
deceased, for $2,314.40, bearing date June 10, 1881; but denies

that the payments were made by the administrators under any mistake of fact in connection with the debts on which same were being paid, and denies that said S. S. Cunningham concealed from said administrators of James L. Cunningham, deceased, any fact in connection with said notes, either as to the date of the same, the time when due, or the amounts owing thereon; but on the contrary furnished the said administrators full information in all these respects by sundry statements and calculations of the amounts due, thereby giving them full information in all respects as to the nature of said indebtedness; denies there was any mistake of fact under which they made said payments, but the mistake, if any, on their part, was a mistake of law; therefore he says the defendants ought not to take anything by their answer, so far as the same is in the nature of a cross bill, and prays that he may be dismissed, etc.

At the November rules, 1897, plaintiff filed his second amended bill, to which defendant William L. Cunningham demurred on the 1st day of February, 1898, of which demurrer the court took time to consider, and on April 29, 1898, the court overruled the demurrer and granted demurrant leave to answer within thirty days. The said bill adopts the averments and allegations of the original and amended bills, and refers to the answer of William L. Cunningham, one of the administrators of James L. Cunningham, to the original and amended bill, in which he pleaded and relied upon the statute of limitations to prevent the recovery of plaintiff's debts, and plaintiff alleges that the debts set up in said bills and in this second amended bill are not barred and that he should not be prevented from recovering the same either against personal or real assets of the estate of James L. Cunningham, by reason of the facts set out in his said second amended bill, and proceeds to exhibit various letters, statements and correspondence between said William L. Cunningham, who plaintiff alleges was not only the acting and active administrator of the estate of James L. Cunningham, deceased, but the agent of his co-administrator, J. N. Cunningham, and also in his own right and as agent of the other heirs and distributees of James L. Cunningham, and S. S. Cunningham, whereby it is alleged that said W. L. Cunningham acknowledged in writing and signed by himself the existence of the indebtedness due plaintiff's decedent on said two notes or bonds of $2,314.40 and $100.00, and in

his said capacities expressly promised to pay the same with the full knowledge at the time of making such acknowledgment and promise of the character and nature of such indebtedness of his father's estate; alleging that shortly after the death of plaintiff's decedent and both before and after the institution of this suit he had made and caused to be made careful search among all the papers of S. S. Cunningham, deceased, for letters, correspondence and other memoranda relating to the indebtedness of James L. Cunningham to the estate of plaintiff's decedent and these papers, except exhibit No. 5, were not found, although due diligence was used in the search, until about three weeks prior to the writing of the second amended bill, when the same were discovered by accident as plaintiff was informed and believed by one Mrs. ———— Jefferson in the back drawer of an old desk used by plaintiff's decedent; that with the paper writings filed with the bill signed by William L. Cunningham were found the annexed copies of what were evidently replies thereto in the handwriting of plaintiff's decedent, the originals of which plaintiff believed and charged were sent and mailed to and received by said defendant William L. Cunningham, and called upon said William L. Cunningham to discover and produce the original of the paper writings, copies of which were filed with said second amended bill as exhibits, alleges that said administrators William L. and J. N. Cunningham as he was informed claim to have paid and taken up a number of debts against the estate of their decedent on account of which there is owing to them as administrators a large sum of money from the estate, that such debts to which they are entitled by subrogation are not barred by the statute of limitations but are valid and subsisting debts against the real estate of their decedent, and if therefore it should appear that the debts due to plaintiff's decedent are not barred as to the personal assets, but are barred as to the real assets of the said James L. Cunningham, then plaintiff asks that the assets may be marshalled so that the creditors whose debts are not barred as to the real assets may be required to seek satisfaction from that source, leaving the personal estate of the said James L. Cunningham for the satisfaction of the plaintiff's several debts, which second amended bill was verified.

On the 26th of September, 1898, by leave of the court, the defendant William L. Cunningham filed his separate answer in

which he adopts the allegations of his answer to the original and
first amended bill; that he has no knowledge of his decedent hav-
ing made the note for $2,314.40, does not admit the making
thereof, but on the contrary controverts it, neither does he know
of his own knowledge of James L. Cunningham having made the
$100.00 note or bond of September 28, 1885, nor admit the mak-
ing of it, but on the contrary controverts it, and says if such
notes or bonds were made the same or a considerable part there-
of have been paid, and if not paid, have been barred by the sta-
tute of limitations which he is required by law to set up in de-
fense thereto, and denied having made any acknowledgment of
the indebtedness evidenced by said notes or any promise to pay
the same which would either prevent the statute of limitations
from barring said debts or which would remove the bar of the
statute thereto; admits that he, as one of the said administrators,
made general payments of money on indebtedness claimed by
said S. S. Cunningham to be owing to him by the estate of said
James L. Cunningham, to-wit, the sum of $500.00, March 31,
1893, and $100.00 May 7, 1894, both of which were made
through the mail, and whatever knowledge respondent then had
was obtained by him from the said S. S. Cunningham, who was
fully trusted by him in that respect and respondent was at that
time wholly ignorant that more than ten years had elapsed from
the time the alleged note of $2,314.40 had become payable, said
S. S. Cunningham having carefully concealed from respondent
the time when this alleged note or bond was payable, and denies
that S. S. Cunningham wrote and mailed to respondent the state-
ment, copy of which is filed with the bill, and says that S. S.
Cunningham had no right to apply the payments so made, but
if such note as the $100.00 really existed he should have applied
sufficient to pay that off and returned the residue to respondent,
as having been paid by him by mistake of fact. Respondent
says he kept no copies of letters written by him to S. S. Cun-
ningham, and is unable to say positively whether exhibits Nos.
3, 5, 6, 8, 11, 12 and 13 are copies of letters written by him, does
not know that he wrote such letters, does not admit that he did,
but controverts the statement in plaintiff's bill charging him
with writing the letters of which said exhibits are copies; avers
that all the correspondence he had with said S. S. Cunningham
touching the alleged indebtedness to him of the estate of James

L. Cunningham was as one of the administrators of said James L. Cunningham and in no other way or capacity; that he never was agent for the other administrator of James L. Cunningham, nor was he agent for any of the heirs or distributees of said James L. Cunningham, nor did he ever represent himself to said S. S. Cunningham as the agent of his co-administrator, or as agent of any of the heirs or distributees of said James L. Cunningham, neither admits as alleged that he acknowledged the existence of the indebtedness claimed by plaintiff in his bill nor expressly or otherwise promised to pay it; nor that he had full knowledge of the nature of plaintiff's claim, but the only information he had respecting it was what he obtained from S. S. Cunningham until within less than one year of the time this suit was brought, which answer was also verified.

The commissioner returned his report, which was excepted to by the administrators of James L. Cunningham because he applied the payments of $500.00, March 31, 1893, and $100.00, May 7, 1894, on the note of $2,314.40, which was barred by the statute of limitations, whereas he should from the sum of the two payments have paid the note of $100.00, which was not barred and the residue of the sum of the two payments he should have reported in favor of the administrators of James L. Cunningham as a debt owing to them by the estate of S. S. Cunningham, as for money paid by mistake of fact, they not knowing that the $2,314.40 note was barred by the statute of limitations. Plaintiff excepted to said report because it reports as barred by the statute of limitations and refuses to audit as a debt against James L. Cunningham's estate the note of $2,314.40 dated September 28, 1881, and filed eighteen other exceptions thereto. On the 25th day of January, 1899, plaintiff moved the court to hear the cause, to which motion defendant William L. Cunningham objected, and moved the court to continue the cause so as to allow him to take depositions, and the court overruled plaintiff's motion and continued the cause and on the 3rd day of May, 1899, the cause was heard and submitted when the court took time to consider, and on the 14th day of June, 1899, the court decreed that the plaintiff recover of and from William L. Cunningham and James N. Cunningham, administrator of James L. Cunningham, deceased, the sum of $3,895.16, with interest from the date of decree, being the amount due, with

interest to that date on the said two notes, to be levied of the goods and chattels in their hands to be administered and further ascertained and decreed that the same was a valid and subsisting debt binding the real assets of the estate of said James L. Cunningham, in the hands of his heirs at law, and the court overruled the said exception of the defendants, the administrators of James L. Cunningham, to the report of commissioner W. B. Colston and sustained the first exception of plaintiff thereto, and without passing upon the plaintiff's other eighteen exceptions to said report recommitted the cause to said commissioner. The defendants, William L. Cunningham and J. N. Cunningham in their own right and as administrators of J. L. Cunningham, John K. Cunningham, Mattie A. Cunningham and Mary E. Cunningham, appealed to this Court, and say they are aggrieved, *"First:* Because the court determined upon the record before it that the administrators of James L. Cunningham, deceased, were indebted as fiduciaries to the complainant in the sum of $3,895.19, with interest from the date of the decree. To have reached this conclusion under the pleadings and facts as shown by the record the court must have held: *First*: That the promise of one of the two administrators is sufficient in law to prevent the operation of the statute of limitations. *Second:* That William L. Cunningham, one of the administrators representing the estate of James L. Cunningham, deceased, had not only acknawledged the justice of the debt of the plaintiff's intestate against said estate, but had expressly promised to pay the same. *Third:* That William L. Cunningham, as administrator and in his official capacity, acknowledged the indebtedness as due and expressly promised to pay the same. *Fourth:* That the letters produced in evidence, signed by William L. Cunningham, individually and not as administrator, marked Exhibit No. 3, exhibit No. 15, exhibit No. 5, exhibit No. 20, and exhibit No. 6, constituted in law an acknowledgment by the fiduciary of the justice of the indebtedness, that it was due, and an express promise that he would pay. *Fifth:* That there being two debts claimed by the plaintiff as due, that the acknowledgments and promises claimed to be contained in said letters were definite and certain as applying, not to one or either, but to both of the bonds set up in said bill."

What the effect under sections 8 and 9, chapter 104, Code, of

a promise in writing or acknowledgment in writing from which a promise of payment may be implied, made by a personal representative, before the debt is barred, or before the decedent's estate could have been protected seems not to have been decided in this State, but in the case of *Van Winkle* v. *Blackford*, 33 W. Va. 573, syl. 3, it is held: "In this state the administrator by his verbal promise, can no more prolong the vitality of a debt of his decedent, not yet barred, beyond the limit of the statutory bar, than he can revive a debt already barred; neither has he any option about protecting the estate by interposing the statute of limitations, when applicable." This is a clear ruling on the statute as to a *verbal* promise or acknowledgment, but we can only have an inference from it as to a promise or acknowledgment in writing, but it seems to have been well settled in Virginia. In *Bishop* v. *Harrison*, 2 Leigh 532, in an action of *assumpsit* against the administrator *de bonis non* to recover a debt due from the testator the question was whether it was competent to plaintiff to join counts on promises by the executor *as executor* with counts on promises by the testator, in order to save the statute of limitations. Judge Cabell in the opinion of the court says: "Upon the whole I am decidedly of opinion that, if the two counts founded on the promises of the displaced executor in this case, has been properly framed, the demurrer to them ought to have been overruled." He further says: "It is clearly competent to an executor by his promise to pay a debt of the testator, to exempt the case from the operation of the statute of limitations, and it is no *devistavit* in him to do so," and Judge Carr in the same case gives the following reasons for such power in the personal representative: "The executor or administrator represents the testator or intestate completely; he has the legal estate; and it is necessary that he should have it, both for its management and for the safety of those who deal with him. When he has made a contract as to any of the property, which he had a perfect right to make, and another has thereby gained an interest in that property, his subsequent death or removal cannot effect that interest. In truth the question does not seem to me to be one of privity, but of power. Here was a debt claimed of the testator; to whom was the creditor to look? To the representative. He applies to the executor while the debt is yet untouched by the statute of limitations, and tells him, here is

a debt due me by your testator and here is the proof of it: it is a debt due by simple contract, and I must sue at once. The executor replies, I see the debt is just, and I tell you before this witness that I will pay it; therefore you need not bring suit, but give me time till money of the estate comes to my hands. The creditor waits; the executor dies; an administrator *de bonis non* is appointed; shall he say to the creditor, the promise of the executor does not bind me, nor take your debt out of the statute? Surely no. The promise does bind him, or rather the estate, at least so far as to remove the bar of the statute; for the executor was clothed with full power to do what he did." In *Braxton* v. *Harrison,* 11 Grat. 30, it is held: "That although it is generally true that an executor or administrator cannot create a new cause of action against the estate yet, he may make a valid promise to pay a debt not barred by the statute of limitations out of the assets of the estate, upon which a suit may be maintained." See also *Smith* v. *Pattie,* 81 Va. 662; *Switzer* v. *Noffsinger,* 82 Va. 524 and cases there cited. These decisions seem to settle clearly this question contrary to the views taken by counsel for appellants in their very able and plausible analysis of section 9, chapter 104, Code, which is substantially the same as that contained in the Code of 1849. They refer to the report of the revisors of January, 1849, in support of their theory, but it seems to me that a careful inspection of that report and the authorities there cited have reference to the acknowledgment and promise of a personal representative removing the bar of the statute after it has run and the claim barred. The revisors, after citing *Tullock* v. *Dunn,* 21 Eng. Com. Law Rep. 478, that "As against an executor an acknowledgment merely is not sufficient to take the case out of the statute; there must be an express promise," that "the promise by one is not enough to entitle the plaintiff to recover; there ought to be a promise by both," which Parke, B., in *Scholy* v. *Walter,* 12 M. & W., 514 says, "is founded in justice and good sense, and ought to be followed," say: "We think it wise not only to follow it so far as it has gone, but to go a step farther, and in accordance with the opinion of the Supreme Court of the United States, in *Thompson* v. *Peter,* 12 Wheat. 565; and the supreme court of Pennsylvania, in *Fritz* v. *Thomas,* 1 Whart. 66, establish that in an action against a personal representative, in his official character, no proof of an acknowledg-

ment or promise by him will take the case out of the statute of limitations." The section to which this note is appended (being substantially our section 9 of chapter 104) will accomplish this purpose, and at the same time attain the object of the latter part of section 2, Acts 1841-2, p. 55, chapter 98, which provides that no debt shall be protected against the operation of the statute of limitations by any *assumpsit* of the executor or administrator so as to charge the real estate in possession of the heirs or devisees with the payment thereof." The cases cited by the revisors in 12 Wheat., U. S., and 1 Whart, Pa., are both attempts to prosecute actions on acknowledgments or promises of personal representatives on claims already barred when the promise was made, and had no reference to promise on debt alive at time of promise. Appellants refer to a late case decided by this Court, *Stiles* v. *Laurel Fork,* 35 S. E. 986, and say that "It seems to decide conclusively the questions involved in this case." It is there held, syl 1, "An administrator cannot by the acknowledgment in pleading of a debt against his decedent which is barred by the statute of limitations, or in any other way remove the bar of that statute," that is, when the bar has taken place he can in no way whatever remove that bar. As provided in section 9, "No acknowledgment or promise by any personal representative of a decedent * * * * shall charge the estate of such decedent * * * * in any case in which, but for such acknowledgment or promise, the decedent's estate * * * * could have been protected under the sixth section of this chapter." "Could have been protected" when? Why clearly at the time the promise or acknowledgment was made. If the statute had already taken effect the administrator could not revive the debt by any act or promise, and there is nothing in the case cited intimating that a new promise might not be made in writing by a personal representative to pay a debt not yet barred by the statute, which would make a new starting point from which the statute must run as against the personal assets of the decedent.

As to the first proposition, whether in case of joint administration the promise of one administrator is sufficient in law to prevent the operation of the statute of limitations, appellants seem to rely with great confidence on the case of *Tullock* v. *Dunn, supra,* in an action against several executors, wherein Lord Ch. J. Abbott says, "the promise by one only is not enough

to entitle the plaintiff to recover; there ought to be a promise by both." This question seems never to have been decided either in Virginia or West Virginia, but in the case of *Tazewell* v. *Whittle,* 13 Grat. 329, which was a suit to enforce the collection .of a debt on a new promise or acknowledgment by one of two personal representatives of the deceased debtor, the debt having been barred at the time of the testator's death, while the case of *Tullock* v. *Dunn* is referred to both by counsel in the argument and by Judge Moncure in his opinion in the case, the question of the acknowledgment or new promise being insufficient because not made by both the personal representatives is not mentioned. The fifth syl. in the case is, "To take a debt out of the statute the acknowledgment of an executor must be express. And quaere: If there must not be an express promise to pay?"

In the case of *Shreve* v. *Joyce,* 36 N. J. 44, (13 Am. хеp. 417) the question is fully discussed and many authorities cited, and it is there held, "A promise by one of two or more executors is sufficient to take a debt of the testator out of the statute of limitations." In this case Judge Bedle says: "The only direct adjudication upon the subject in the English Courts is the case of *Tullock* v. *Dunn* and that has only the force of a *nisi prius* decision."

So in *Briggs* v. *Starke,* 12 Am. Dec. 659 (2 Mill. 111) where a motion was made to set aside the verdict in the case on the ground "that the promise of one executor is not sufficient to take a demand out of the statute of limitations, nor to prevent it from running against it," the court held that "new promises made by one of the several executors, takes the case out of the statute."

As stated in the New Jersey case cited, "the question is one of first impression, and we are at liberty to declare the law as we think most in accordance with the principle." The statute, section 9, chapter 104, Code, clearly recognizes a difference in the application of the principle as between personal representatives and joint contractors as it provides that "no acknowledgment or promise by any personal representative of a decedent, or by one of two or more joint contractors shall charge the estate of such decedent, or charge any other of such contractors in any case, in which but for such acknowledgment or promise, the decedent's estate or another contractor could have been protected under the sixth section of this chapter." In the case of joint personal rep–

resentatives the action of the one affects only the estate of which he has control and casts no personal liability on his co-representative while in the case of joint contractors the action of one, but for the statute, might involve the personal liability of his co-contractor. In *Wheeler* v. *Wheeler,* 9 Cowen it is held that "Executors are esteemed but one person in law; and acts done by one of several, relating to the delivery, sale or release of the testator's goods, are the acts of all. Thus one or two executors may assign a note belonging to the estate of their testator. So he may pledge such note or assign it, as collateral security for a judgment obtained against the estate of the testator." *Stribling* v. *Coal Co.,* 31 W. Va. 82; *Johnson* v. *Beardslee,* 15 Johns. (N. Y.) 3.

The second, third and fourth propositions of appellants as to the conclusions arived at by the circuit court under the pleadings and the facts shown by the record will be considered together. After the suit was matured on the bill and amended bill, and Wiliam L. Cunningham had filed his answer relying upon the statute of limitations to protect the estate, he represented, the cause referred to a commissioner and the larger debt of plaintiff reported as barred and exceptions to report filed, the heirs at law of James L. Cunningham then filed their answer, in which they relied upon the statute of limitations, neither said bills nor answers being sworn to, and before any action was taken on these matters, plaintiff discovered writings and correspondence between the defendant William L. Cunningham and plaintiff's decedent touching the indebtedness of said James L. Cunningham's estate to plaintiff's intestate upon which plaintiff based his second amended bill which was sworn to. These writings are relied upon to prove a new acknowledgment of the debt by the administrator William L. Cunningham, and a new promise to pay the same. The writings consist of letters written by said administrator to S. S. Cunningham, plaintiff's testator, and the replies thereto, and are exhibited with the said second amended bill. The bill sufficiently accounts for the delay in their production, having then been recently discovered for the first time. None of the heirs answered the said second amended bill. Their answer formerly filed not being under oath could not be taken as such answer unless sworn to and refiled and relied on by them The only answer to this bill is that of William L. Cunningham

as administrator of James L. Cunningham. The bill is taken for confessed as to all the heirs, and surely the allegations of the bill affect their interests directly, as it alleges that said William L. Cunningham in conducting said correspondence, in writing the letters and receiving the replies and statements was acting not only as the active administrator of the estate of his and their father, but as agent for his co-administrator, and for all the heirs at law of James L. Cunningham. The first letter shown by the record, written by William L. Cunningham to S. S. Cunningham, bears date August 18, 1887, and starts out by saying: "Having qualified as one of the administrators of my father's estate, I write to you to please send me the amount of your note, with interest on same up to the 1st day of September, 1887, against this estate; contrary to all expectations he left no will. I have no doubt but what his estate will hold out, and there will be a good large margin to go on," etc. In response to this it is alleged that on August 22d, same month, S. S. Cunningham wrote and mailed to him a statement in writing showing the dates of the notes, one for $2,314.40, the other for $100.00, and the interest up to September 1st, 1887, as requested, and also the application of a payment of $100.00 entered as a credit on account of interest June 27, 1885, and exhibits said statement and letter of S. S. Cunningham transmitting it. Defendant in his answer does not say that he never received or had such statement. He does say: "It is not true as alleged in plaintiff's second amended bill that he, the said S. S. Cunningham, wrote and mailed to this respondent the paper writing, a copy of which is filed with plaintiff's second amended bill as exhibit No. 4." Respondent in his answer says further that, "He does not know that he wrote such letters and does not admit that he did, but controverts the statement in plaintiff's bill charging him with writing the letters of which such exhibits are copies." Yet it was well proved by the depositions of witnesses who were well acquainted with his handwriting that he did write them, and although the cause was continued on his motion to allow him to take depositions, he neither went upon the witness stand himself nor took depositions of others. On the back of the letter of August 18th requesting a statement of plaintiff's intestate's debt, written by William L. Cunningham, is a pencil endorsement proved to be in the handwriting of S. S. Cunningham, in the fol-

lowing words: "Statement sent with interest to September 1st,
1887, shows balance to that date $2,912.21," which statement so
fixing the amount gives the dates and amounts of the notes and
the letter accompanying the same dated August 22 acknowledges
the receipt of the letter of 18th of August, and says, "According
to your request, hand you a statement of your father's indebted-
ness to me with interest to September 1st, 1887. I have given
you the dates and amounts, and hope you will find the interest
correctly calculated. I am very much pleased to hear satisfac-
tory statement you give of his affairs." On the 29th day of Sep-
tember William L. Cunningham wrote to S. S. Cunningham in-
cluding statement of the latter's taxes for 1887 which ne nad ob-
tained from the deputy sheriff, and said in closing his letter, "I
want to come over to your place and talk to you about your debt
against the estate of my father as soon as I am a little footloose."
When he wrote this letter he must have received the statement
of the debt or been in possession of facts in relation to the debt;
that he wanted to see him about it, presumably to make some
arrangement for its payment. On the 24th of December, 1888,
he wrote another letter to S. S. Cunningham saying that he had
advertised the Falling Waters farm very extensively. "We must
sell it if not this time, it must go soon for whatever it will bring.
With the incumbrance on the land we cannot make it pay the
interest and taxes, consequently we must sell. $35.00 per A. is
the minimum price we will let it go at this time. At that price
it will let us out. I consider it is well worth that—at the pres-
ent price of products I think it can be made *neat* four per cent
at that figure. We raised this year on it about 925 bu. wheat,
about that much corn, clover seed enough to sow, enough clover
hay to feed the tenants' stock, fencing in reasonable good repair.
I now ask you if we cannot get that price publicly, will you take
it at that? We will pay the taxes for 1888. You would be en-
titled to two-fifths of the growing wheat crop, and if you would
desire to rent it and wish it I will attend to that for five years,
should you and I live that long, free of charge. We have a good
tenant on the farm. You have a big pile in it—would not feel
the buying of it very much. On the other hand it certainly
would be a great relief to us all, and more especially to mother
and Mat. Please consider the matter and let me hear from you
soon regarding it." Here we have an express acknowledgment

of the debt after he must have had full and complete knowledge of the evidence of such indebtedness, not only this admission of the debt, but a direct offer to pay the debt with real estate, of which his father died seized, calling his attention to the producing capacity of the farm offered, telling him what proportion of the growing wheat crop he would be entitled to from the tenant and among other inducements to buy it, said "We will pay the taxes for 1888." Here he must have been speaking of the heirs, he being one of them, and also calling his attention to the fact that he had a "big pile in it," that is, had a large debt against it which would apply on the price of it, hence he "would not feel the buying of it very much," and adds, "on the other hand, it certainly would be a great relief to us all, and more especially to mother and Mat." The writer surely was representing some parties besides himself, persons who were considering themselves or their property liable and bound for the indebtedness which they could pay off in case they could induce their kinsman to buy it on account thereof, and closes his letter by asking him to consider the proposition and let him hear from him. It is clearly indicated by that letter that he was representing the heirs. On the 14th day of March, 1889, William L. Cunningham wrote S. S. Cunningham, saying, "I received your note some time ago; proceed to answer. As we have a little funds left in our hands from the estate after paying the most urgent demands, I will enclose you check this time for the amount of $125.00 as you will see. Please return the enclosed receipt after signing. I certainly wish we could sell, but that seems impossible to do, even at a great sacrifice. I am tired of worry with it and the debts thereon. * * * * Sometimes I think if we could make arrangements with the creditors to divide the property and the debts it would be better. * * * I would like to see you and talk about it. After the personalty of the estate is settled up, there will still exist about $8,500.00 indebtedness. There is as offsets to that six hundred acres of land in addition to two notes of J. R. Cunningham aggregating about $2,400.00, for which the farm is bound *for*." This is a part payment on the debt evidenced by a writing signed by the acting administrator. In *Foster* v. *Starkey*, 12 Cush., (Mass.) 324, Shaw, C. J., says: "It was laid down amongst other rules well settled that a part payment of principal or interest is unequivocal evidence of a

new and continuing promise, to avoid the statute of limitations, and forms a new point from which the statute begins to run," and cites *Sigourney* v. *Drury,* 14 Pick. 387. If part payment is a continuing promise and such payment be made in writing signed by the party making it, it would seem that it would be a new promise in writing. Waits Actions & Def., 297; 13 Am. & En. E. L., 748.

Our statute was intended, we may concede, to render ineffective all oral evidence of a new promise or acknowledgment, and that, in consequence, it destroyed the effect of parol proof of a partial payment. To this extent only can the contention of the appellants in their petition be considered sound, when they assert that our statute destroys the effect of a part payment. The true rule, as shown by the foregoing authorities is, that our statute has changed the mode of proof; the new promise or the acknowledgment of a subsisting debt, which is made by statute the equivalent of an express promise, must now be evidenced by a writing signed by the debtor, or by his agent. Our statute has no other effect. As a part payment was before the passage of the statute not only the best form of an acknowledgment of a subsisting debt, but in the language of Chief Justice Shaw, already quoted, "unequivocal evidence of a new and continuing promise," so it remains since our statute; and if the evidence of it is in writing, signed by the debtor or his agent, it is a new promise in writing, and may be proved. It has been so held in a multitude of cases, arising under the English statute, which was constructed by the courts as making ineffective parol evidence of part payments. See the review of them in *Williams* v. *Gridley,* 9 Metc. 482.

On the 26th day of March, 1889, said William L. Cunningham wrote and signed another letter to S. S. Cunningham, which evidently refers to the receipt returned to him by S. S. Cunningham, as he requested for the payment of the said $125.00, in which he says: "Yours was received a few days ago, with thanks for the remittance; it was not as much as I expected to send you but as we must keep a little surplus on hand it was all we could spare at this time, but hope to send you more soon. We have but one note in bank; and that we have been making every effort to pay by installments, and have gotten it considerably reduced. We expect to close the estate soon so far as we as administrators

are concerned, and think we will run it on the responsibility, of the heirs of James L. Cunningham, dec'd, at that time if necessary, we will confess judgment on all the paper by taking up the old and giving our paper for it as heirs. I do not think that any of the creditors need be uneasy as the debts are $8,500.00, or near about that figure, when there is between one thousand and one thousand and one hundred acres of land bound for them, would sell and pay it if we could do so, rather than carry the load and worry." We have here a reference to the payment made before mentioned, and an explanation why it could not be a larger payment at the time, with the expression of hope to send more soon. The amount paid at that time was more than sufficient to pay off the $100.00 note, and interest, at that time, if it had been so applied, and yet there was no question raised as to any part of the debt, but the whole tenor of the letter is to the effect that they want and expect to pay the debt and the letter admits that the lands of the decedent and father, James L. Cunningham, are bound for these debts. In *Abramhams* v. *Swann,* 18 W. Va. 274, it is held, (syl. pt. 5): "If such acknowledgment or promise is contained in a letter of the defendant to the plaintiff, it is not necessary that the amount of the debt, or that its date should be specified in the letter, but the particular debt to which the letter refers, may be identified by extrinsic evidence, written or parol; and if so identified clearly, and the promise is unequivocal, or the acknowledgment is of a subsisting debt, for which the defendant is liable and willing to pay, the bar of the statute of limitations is thereby removed." The construction of such letters is fully discussed by Judge Green in that case, beginning at page 282. It is impossible for an unbiased mind, from the record, to come to other conclusion than that William L. Cunningham received from S. S. Cunningham, the statement of the debt marked exhibit No. 4, in reply to his request for it of August 18, 1887, which statement gave the dates and amount of the two notes, with calculation of interest to September 1, 1887. In all the letters written by William L. Cunningham, there is not a word of protest or question about the justice of it. He seems to have known of the existence of the notes from the time of his qualification as administrator. There was no other debt due from his father's estate to S. S. Cunningham, and all the correspondence was concerning that particular

debt. There is no question about the identification of the debt, and no equivocation on his part about paying it if in his power to do so. Appellants insist that the court erred in the decree of June 14th, 1899, in decreeing that the amount of said debt, is a valid and subsisting debt binding the real assets of the estate of James L. Cunningham in the hands of his heirs at law because of the provision of the statute, the latter part of the 2d section, chapter 98, Acts 1841-2, p. 55. It is true the promise of an administrator made wholly in his representative capacity and without authority from the heirs at law would not stop the running of the statute as to the real assets and as against the heirs any more than a judgment against the administrator would as held in *Saddler* v. *Kennedy,* 26 W. Va. 636. But the second amended bill alleges that in writing the letters in which the promises were made William L. Cunningham was not only acting in the capacity of administrator, but was acting for and on behalf of his co-administrator and of the heirs at law and by their authority, the bill is taken for confessed as to all of them, whereby they admit that William L. Cunningham was so acting for them as their agent, and so corresponded and dealt with plaintiff's decedent, S. S. Cunningham. The second amended bill virtually made a new case for the same purpose as the letters and documents discovered and exhibited with the new bill, which contained allegations that the other bills did not contain. Under section 38, chapter 125, Code, the said bill being verified by the oath of the plaintiff could only be answered under oath, so that the answer filed by the heirs at law to the original and amended bills could not be treated as their answer to the second amended bill. On the 3d day of May, 1899, the cause was heard on the papers and proceedings theretofore read and had therein, on the plaintiff's second amended bill and exhibits filed in open court, process duly served on all the defendants to said bill and on said bill taken for confessed; on the answer of William L. Cunningham, administrator, theretofore filed, and general replication thereto, also on depositions, etc. In *Wilson* v. *Preston,* 15 Iowa 246, it is held that "It was competent for the court to permit the party to attach the verification after respondent had answered. After it was attached, it was as much the duty of respondent to verify his answer as if the petition had been sworn to in the first instance. The answer as filed was no response to

the petition as amended." *Radford* v. *Fowlkes*, 85 Va. 821; 1 Am. & Eng. Enc. Pl. & Pr. 625. The second amended bill is wholly unanswered except by William L. Cunningham in his capacity as administrator, and is taken for confessed as to all the heirs at law and the co-administrator. This is an admission of all its allegations, that William L. Cunningham was, in writing the letters the sole acting administrator (and this fact is not denied by said William L. Cunningham) and the agent of his said co-administrator, and that in making and delivering such letters and writings he was acting with the full knowledge of and as the agent for the other distributees and heirs at law of said James L. Cunningham. Section 36, chapter 125, Code, provides that "Every material allegation of the bill not controverted by answer * * * shall for the purpose of the suit be taken as true, and no proof thereof shall be required." In *Cann* v. *Cann*, 45 W. Va. 563, it is said by JUDGE DENT: "The fact that adult defendants failed to answer, denying the plaintiff's right of recovery, weighs heavily in favor of the justice of plaintiff's demand. They were his sisters and should have been acquainted with the circumstances; and a legal admission by them (referring to the bill being taken for confessed) is almost equivalent to positive proof or affirmation. As to themselves, it certainly is so regarded by the law of pleading." *Cann* v. *Cann*, 40 W. Va. 138; *Bank* v. *Shirley*, 26 W. Va. 563. With the second amended bill are filed as exhibits several other letters written after the expiration of ten years from the date the larger note fell due, one from S. S. Cunningham to William L. Cunningham, dated January 13, 1893, enclosing a statement of the two notes showing the interest due to January 1, 1893, to be $1,145.42, requesting its payment by the 1st of the following April. Another by William L., dated January 21st, 1893, acknowledging receipt of the statement, and saying, "We will do the very ———— for you that we possibly can by the 1st of April. We are certainly very much obliged to you for leniency thus long." And after speaking of some persons being behind with them on their interest to them on the farm in Frederick county, Virginia, about $900.00, says: "If we can in any way collect that we will be in no trouble to raise the full amount of your interest." In January, 1894, S. S. Cunningham sends him another statement of the whole amount due him, $3,240.89, April 1st, 1894, and asks him if he can to

pay back interest, $826.49, and the principal of the small note, $100.00, in all $926.49, by the first of April next. On the 8th of March, 1894, William L. wrote S. S. Cunningham that he had received the statement some time ago, and refers to the interest and smaller note of $100.00, making in all $926.49, and refers to his wanting it by the 1st of April, 1894, and goes on to tell him why they cannot pay it by that time, speaks of selling land and asks him if he could not make some terms and buy one of the farms. "It would be a great relief to us, and I hope no encumbrance to you. I close by repeating that I will do the best I can for you." April 2, 1894, William L. again wrote to S. S. Cunningham: "In regard to the payment of you some money, I will say that I have been disappointed in getting some for you on the 1st of the month, as requested, but I will state that if there will be no further disappointment, I expect to get some during the month some time. If I am not disappointed I will bring it over to you." On May 7, 1894, William sent to S. S. Cunningham check for $100 which he says was all he could raise for him at that time, and saying that he could do no better. These last mentioned letters are no proof of promise by the administrator which could prevent the running of the statute of limitations, being written after the statute had run, but under the pleadings, and facts alleged in the second amended bill and confessed by the co-administrator and all the heirs at law of James L. Cunningham, they amount to a promise on their part to pay the debt and which is sufficient to charge the real assets therewith. They show clearly that it was always the purpose of the administrators and heirs to pay the debt, and it was only when suit was brought that they seemed first to conceive the idea of pleading the statute of limitations, and being the beneficiaries of the real assets of their father's estate is sufficient consideration for the promise. *Johnson* v. *Beardslee,* 15 Johns (N. Y.) 3; *Bradshaw* v. *Bratton,* 96 Va. 577.

There being no reversible error in the decree, the same should in my opinion be affirmed.

DENT, JUDGE, (*dissenting*):

The section of the law construed is as follows: "No acknowledgment or promise of any personal representative of a decedent,

or by one of two or more joint contractors, shall charge the estate of such decedent, or charge any other of such contractors in any case, in which, but for such acknowledgment or promise, the decedent's estate or another contractor could have been protected under the sixth section of this chapter." The first point of the syllabus construing this section is as follows:

"An executor or administrator cannot make a new promise to pay a debt of his decedent, either before or after the debt has been barred by the statute of limitations."

This construction renders wholly meaningless the following words or clause, "in which, but for such acknowledgment or promise the decedent's estate * * * * * could have been protected under the sixth section of this chapter," and amends the section so as to make it read: "No acknowledgment of any personal representative of a decedent shall charge the estate of such decedent in any case." The power of construction is certainly great when at one fell swoop, it can eliminate a complete qualifying clause from an enactment of the legislature. That this has been done in this case there can be no question. The effect of so doing is simply to deprive the personal representative of a power heretofore vested in him, both by common and statute law for the protection of the decedent's estate, to prevent unnecessary suits against it, and its devastation by the costs of useless litigation. This power was of no benefit to the creditor whose debt was in danger, for the courts are open to him, and by suit against both heir and personal representative he can easily prevent the bar of the statute though by so doing he mulct the estate with costs which by proper arrangement with the personal representative heretofore could have been avoided. But now no creditor dare wait or hesitate if his debt is threatened by the bar of the statute. He must bring his suits, one at law against the personal representative and the other in equity against the heir for the promises of the personal representative though full handed with assets, are worthless either as against himself or the estate. Being bound to plead the statute to save the estate he would not be liable individually for the reason that his promise would be without consideration, as the estate would not be liable for the debt if paid by him after its bar, and the law as promulgated by the court makes his promise wholly void, that is, neither binding on himself or the estate, it matters not what may be the condition

of the assets.  Neither can a testator clothe his executors with
power to make arrangement with his creditors for the benefit of
his estate if the statute of limitations is involved.  Creditors
must sue to save themselves, and the executor is powerless to pro·
tect the estate entrusted to his care from unnecessary costs.  The
holding of the court makes suits against the personal representa-
tive, heirs or devisees absolutely necessary to prevent the running
of the statute.  No such thing was contemplated by the law-
makers and in using the language, now rendered meaningless,
"in which but for such acknowledgment or promise the de-
cedent's estate could have been protected under the sixth sec-
tion of this chapter," they did so advisedly, with the plain im-
port that if the personal representative could not otherwise pro-
tect the estate from a just charge that his promise to pay by
which suit was delayed and the estate protected would operate to
prevent the running of the statute.

And why should not such promise do so?  The estate is sub-
ject to no greater liability by reason thereof, but unnecessary
costs and expenses are saved to it.  But it is said it may delay
the setlement of the estate.  Not necessarily so, unless those in-
terested therein desire such delay for their own and the estate's
benefit.  The creditor is in no wise benefitted by the delay.  He
extends the credit for the estate's benefit, not his own.  Take
even in the present case, if the creditor had sued promptly, would
the estate have been any better off?  And because in some in-
stances the power may have been abused, that is no reason why
it should be denied to all personal representatives, when it is so
necessary for the proper and judicious administration of estates.
The section under consideration was enacted for the purpose of
rendering the preceding section, 8, chapter 104, harmonious with
section 5, chapter 87, Code, wherein it provides that if any per-
sonal representative shall pay any debt, the recovery of which
could be prevented by reason of illegality of consideration, lapse
of time or by any other fact within his knowledge, no credit
shall be given him therefor, and to destroy any inference there-
from that although he could not pay, yet being the legal repre-
sentative of his decedent he might exercise the right of such de-
cedent to renew a debt already barred by the statute by a promise
in writing.  It is strange that this section should have been sev-
eral times re-enacted, carried through various editions of the

Code and construed by the Supreme Court of the State of Virginia with its grammatical construction unchanged, and yet the discovery was never made that the law makers, including the revisors of 1849, had used the wrong tense to express their meaning until the present term of this Court, although if a mistake, it changes the entire meaning of the section as is perfectly apparent to any school child. Grammar is not such a new study that such a mistake so vital to its meaning could be introduced into a statute of importance and carried through so many editions of the acts and code for more than half a century without being noticed by some legal light, although the grammarians of the past may not compare with those of the present. It is not a mistake. The language was used advisedly. Why construe its plain meaning away? It is said it is necessary to remedy the evil the legislature had in view. What evil? The right of a personal representative to protect and preserve the estate. Such evils exist only in dreams. The personal representative has the power to stop the running of the statute as to the personal property by confession of judgment and as to the real estate by instituting a suit in equity. But these legal proceedings will entail costs on the estate. Why then should he not have the power to do the same thing by a proper promise in writing? Why should not such power extend to the real assets as well as personal? Why should he or the creditors be forced into legal proceedings when they could be so easily avoided without detriment and to the benefit of the estate? The only answer is that it might enable him to unduly postpone the settlement of the estate. Those interested under the numerous statutory safeguards could easily prevent such a result, but if for the benefit of the estate and necessary to prevent sacrifice thereof, they ought not to want to prevent it. Such an argument would never have been advanced had not a creditor been duped by false promises into waiting until his debt had been barred by the statute, and now it is not made for the protection of estates generally, but simply for the justification of bad·faith in the present instance. Because one estate is enabled to escape a just debt, many estates are made to suffer thereby, and all personal representatives are shorn of the power they heretofore possessed for the proper discharge of their administrative duties.

Read the statute again: "No acknowledgment or promise of

any personal representative of a decedent shall charge the estate of such decedent in any case, *in which, but for the acknowledgment or promise, the decedent's estate could have been protected under the sixth section of this chapter."*

Protected by whom? By the administrator. If he can protect it without a new promise, it is his duty to do so. But if he cannot protect it without a new promise, it is his duty to make the promise. The limiting clause rejected by the majority of the court necessarily implies that there are acknowledgments and promises of personal representatives that will charge the estate, otherwise it would have been omitted just as the Court now expunges it. What are these acknowledgments and promises of the personal representative that will bind? Such as are made by them when they cannot otherwise protect the estate from sacrifice or loss. Why does such acknowledgment or promise bind the estate? Because the estate gets the benefit thereof, and is protected thereby. The creditor refrains from suit, and extends the time to save cost, expense to and sacrifice of the estate. This section was intended merely as a qualification upon the preceding section, and includes no other subject except the bar of the statute of limitations. There are but two kinds of promises within its purview, both of which are provided for directly or by plain implication. One is where the debt is barred by limitation at the time of the promise, and the other is where it is not so barred. In the one instance the personal representative can and is bound to protect the estate and a promise made by him contrary thereto is void. In the other, he cannot protect the estate without such promise, and it is recognized as valid and binding because of indulgence extended to the estate. Otherwise one creditor being forced to bring suit to avoid the statute might bring the estate into disrepute and precipitate an avalanche of suits against it, involving much needless cost and expense. It was plainly the intention of the revisors of 1849, and of each succeeding legislature down to the present time to preserve to the personal representative the power to protect the whole estate, both real and personal assets, by such binding promise in writing as was necessary for this purpose, until such assets could be made legally and properly available for the payment of debts. The protection of the real estate referred to by the revisors was not the real assets, but such portion of the real estate as had passed

into the hands of an innocent purchaser for value, without no-
tice, under section 5, chapter 86, Code.    All other assets were to
be subject to the protecting power of the personal representative.
Without being guilty of redundancy they expressed this inten-
tion in the section under consideration as plainly as it is possible
for language to express it.    It is true they might have added the
further clause, "But in any case in which such estate cannot be
protected without such promise in writing, the same shall be a
valid charge thereon."    This would be unnesessary repetition,
for the same meaning already exists by necessary implication,
and it might be held that the word "protected" referred to the
time of the plea, and not to the time the promise was made, and
if at the time of the plea, the debt was not barred, the writing
would not be invalid or it might be held that the clause was sur-
plusage and did not change the meaning as now construed.    No
legislation can be armored against the ruthless club of judicial
construction, wielded by willing hands.    My conclusion is that
as to a debt not barred by the statute of limitations the promise
of a personal representative, made for the purpose of protecting
the estate against unnecessary and premature suits, will prevent
the running of the statute and make such debt a proper charge
against the assets both real and personal, except such portion of
the real estate as may have been conveyed by an heir or devisee
to an innocent purchaser for value without notice, as provided in
section 5, chapter 86, Code.    In so far as Judge McWhorter's
opinion is consistent with this conclusion, I concur with him,
and in so far as Judge Brannon's opinion conflicts therewith, I
dissent.